States of America v. Gary Michael Beach. It's clause number 18-11619. Is the appellant ready to proceed? Yes, your honor. Sidney Powell and Bill Hodes for Appellant Beach. Mr. Beach is innocent and we ask the court to vacate the judgment of conviction and render an acquittal on all counts of these charges. There's actually no crime here whatsoever. When you get, the best way I think to get rid of all the noise, and there's a lot of it in this case, is to focus on the actual charges in the indictment. And if you go to record excerpt number 3, which is the indictment on page 3, the government has a chart of wires and checks that they say were paid to Mr. Beach or Beach Petroleum. One of the problems is that the government continually conflated three separate legal entities that their own witnesses admitted were three separate legal entities. But the main point here is that all of these payments in the chart were disclosed. The two wires and one personal check that are the first three were disclosed in the amendment or the supplemental SOFA statement that's behind record excerpt tab 14. Two of those were, but the other amounts which total $90,000 were disclosed in the amendment to the SOFA that was filed on January 31, 12, which is behind record excerpt tab number 12. All those payments in the chart on page 3 of the indictment total $120,000 as pre-petition income that the government claims wasn't disclosed. Well, aside from the fact that he disclosed the trust, which held all the money in his original filing, they disclosed those specific amounts in the supplemental filings behind record excerpts tabs 12 and 14. It's all there. And on top of that, he produced all his bank statements, which showed the exact amounts that were paid. And those are, I think, behind record excerpt tab 14 as well. So basically, the key docs are four record excerpts, the indictment at 3 and then the record excerpts at 10, 12, and 14. They were all government exhibits. They show that all amounts were disclosed. The only issue that leaves then is the post-petition income, which is the chart on page 4 of the indictment that amounts to an additional, I think, $90,000. Every government witness admitted that post-petition income was Mr. Beach's money to keep. It wasn't part of the income. It was his money. He was entitled to keep it. On top of that, he specifically notified his lawyer about it in writing. Our reply brief explains this in detail. He wrote his lawyer about making $15,000 a month. His lawyer said he could do that. It was his to keep. Mr. Defoe himself testified, that's Mr. Beach's bankruptcy lawyer, in the trial that he was adamant that that number be zero, that he reported zero future income. When he amended it, he still reported zero future income, even though he had all the bank records in hand that showed the money. He did that on purpose because he said it didn't matter. Yet Mr. Beach was prosecuted for that, quote, zero future income. So obviously, at least in terms of the government's intent to prosecute here, it mattered. But it didn't, according to all the government's witnesses, because everybody said his post-petition income wasn't part of the bankruptcy estate and he was entitled to keep every dime of it. That is all the money that is at issue in the case specified in the indictment. So then if you go to the exact counts with which he was charged, of course, the jury found, and as respect to counts one and two on the original filings, that there was no crime there. With respect to count three in which they found him guilty, that's the zero future income problem that's attributable solely to Mr. Defoe and his deliberate decision as he admitted in the trial itself as a government witness. Count four talks about the consulting fee income from April 11 to November 2011. Again, that money is pre-petition. It's reported in the amendment to the filing behind Record Excerpt tab number 12. It was $90,000. I mean, yes, that's right, I think $90,000. And then count five, on which the jury found him guilty, was for fraudulently concealing the total amount of consulting fee income, which added pre-petition and post-petition together. So it's infected with the same problem of pre-petition income that is reported and post-petition income, which is completely irrelevant and depended on Defoe's deliberate decision to report zero future income, even though he knew Mr. Beach was going to be earning $15,000 a month. Plus the amendment behind tab 14 discloses another $30,000. The jury found he was not guilty in terms of when he said he had not had any income since he left Playa in February or March of 2011. So when he said he didn't have any income in 2011, the jury agreed with him on that. And he also, the jury also agreed that it hadn't, that no one had paid him any money until January. So the jury understand, understood the difference, at least to that extent, of the separate legal entities. So then that leaves us So they were a good jury until the ones where they decided he was guilty. Pretty much, yeah. They got confused by all the money and the charts the government was throwing around. In fact, at the government, all their charts showed huge amounts of money that wasn't charged in the indictment, that wasn't relevant to these charges, and they combined pre-petition and post-petition income, despite the fact that all their witnesses said post-petition income wasn't relevant at all. And that argument is one that was made to the jury? The one you just made? Yes. I'm not sure how well that was articulated to the jury, if it was even specifically articulated at all. The government combined it all, made it sound terrible, and managed to persuade the jury to convict on those counts. But the evidence is insufficient as a matter of law to sustain those convictions according to the government's own witnesses. Well, on the Roman 7b, there's a challenge, but not to Roman 7a, so isn't that waived? No, sir. We did challenge both those. We challenged criminal intent with respect to the entire case. And those, both a and b, go to the same instance of whether there were two checks or two wire transfers or three. And again, all of that money, that $30,000 or $45,000, is reported in the supplements behind tabs 12 and 14. He reported it a little bit incorrectly, but the total amount is reported there. He didn't specify the additional check. He called it $30,000 from the wire transfers at tab 14, but he didn't see the check. But the check is included behind, in the $90,000 that's reported behind tab 12, because otherwise it would have been $75,000. So the amount of money is correctly reported. He just didn't, Defoe did not pick up, despite having the bank records in hand, that there was one check and two wire transfers. Of course, the creditor's counsel had that information in his hand when he was questioning Mr. Beach and simply led him down the path of saying, oh, yes, there are two. If he had shown him the third one, which he had in the bank records, I'm sure Mr. Beach would have said, oh, yeah, I'm sorry, I forgot there was another check. So he had another $15,000 check that he just forgot. It's all reported, though. He just forgot he got it. It was an innocent mistake. And he made that mistake more than one time, didn't he? No, sir. There wasn't a second time where he failed to report that third check. This is the check that was directly deposited into his account. Right. The amounts are all reported. The $120,000 pre-petition money, which is all that adds up to in the chart on page three of the indictment, that's all the pre-petition money, was reported on record excerpts 12 and 14, the amended filings, every dime of it. Was it broken out as two wire transfers and one check? No. But the $30,000 is reported and then the $90,000 is reported. The government talks about it in terms of $75,000 and $45,000 because of the two different times, but the entire amount was reported in the amended filings. It's indisputable. And now, I mean, obviously Mr. Beach had given him his bank records for two months before he testified in the deposition. It's admitted in the record that Mr. Defoe didn't go through the documents with him or prepping for his testimony at all. And it was an innocent mistake. People don't remember everything under the press of a deposition, but they had the records in their hand, and it was reported in the filings on the amended statements, and there's simply no crime in this case whatsoever. And the decision to say $0 of expected future income, that's Mr. Defoe's decision, not Mr. Beach's? Mr. Defoe's decision solely. He was adamant about it. And so what do we make of the emails in the record from Mr. Defoe to Mr. Beach about the risks associated with the way that this petition was being, the pre-petition behavior, whether it was the house purchase or the various relationships between the trust and Petroleum and Mr. Beach? It sure seems like Mr. Defoe was worried about the way this was going to go south for Mr. Beach after the petition was filed. Well, he did, Mr. Defoe did warn him of the risks if he went ahead and purchased a house in the trust. But even the government's witnesses admitted that the purchase of the house in the trust was a lawful prospect, I mean, it was a lawful function of the trust to provide for his house and dwelling. And Mr. Beach, he didn't say don't do it. He just advised him of the potential risk. But Mr. Beach knew to a matter of certainty that his expected future income was not zero. I mean, he... Well, no, actually he didn't because the oil and gas business is extremely speculative. He didn't expect $15,000 that month? He did at the point that it was reported on the forms. It wasn't like the next day he was out, I mean, the day after the petition? No, but Mr. Defoe knew that. In fact, Mr. Defoe said he expected Mr. Beach to go back to work and earn money. And he still reported it as zero. The record shows that it's solely Defoe's decision, knowing full well by an e-mail from Mr. Beach in writing that he was planning to earn at least $15,000 a month as long as the Black Horse Resources Project held out. Right. But Mr. Defoe is not a defendant in the case. Mr. Beach is, and he was the one who said zero dollars of expected future income. I mean, it's his petition. It's Mr. Beach's petition. It is Mr. Beach's petition, but with Mr. Defoe, his own lawyer, being adamant about putting zero down there, it's kind of unusual to expect Mr. Beach, and certainly doesn't show any criminal intent on his part, not to override the advice of his lawyer. And Mr. Defoe admitted all that on the witness stand, that it was solely his decision. He literally said, I don't see how it matters. And every government witness admitted it was not part of the bankruptcy estate and not available to the creditors. I've got a little bit more time left if the Court has any additional questions. If not, I will ask the Court again to render an acquittal for Mr. Beach on all counts, because all the money was reported, all the bank records were disclosed, he was as transparent as anybody could be. We should not convict people of crimes as a matter of form over substance. And he should be acquitted. Thank you, Counsel. Thank you. All right, Mr. Magliola. Yes, Your Honor. Thank you, Judge Graves. May it please the Court, Joe Magliola for the United States. This Court should affirm all four verdicts against Mr. Beach because the jury heard extensive evidence that he earned well over $100,000 in undisclosed income in 2011, while in 2012 he lied about this income repeatedly and under oath. As a result, he cannot nearly meet the high showing necessary to demonstrate that this Court should reverse any of the counts of conviction on sufficiency review. I'd like to start where Ms. Powell ended by talking about Mr. Defoe. It is no overstatement to say that this was the key theme of the defense case at trial. Mr. Beach attacked Mr. Defoe in his opening statement. He was able to cross-examine him at great length during trial. It was, again, a focus of his closing argument. But I think most importantly here, Mr. Beach requested and received an advice of counsel defense. He didn't object to it at the district court level and he doesn't object to it here. And the advice of counsel defense is where his argument falls apart. Because in order to receive the benefit of that defense, Mr. Beach had to do a number of things. But chiefly here, he had to disclose all material facts that he knew to his attorney and he had to rely on advice that Mr. Defoe gave him. Mr. Beach quite simply kept Mr. Defoe in the dark about the key activities of the Beach 2010 trust in 2011. I disagree completely with my friend, Ms. Powell, about whether or not Mr. Defoe knew about the existence of Beach Petroleum, knew about the participation agreement, knew about the assignment of that participation agreement, knew about his client's activities, his work, his income. In November of 2011, as has been pointed out previously, Mr. Defoe expresses concerns about the arrangement of this trust, the existence of this trust, notwithstanding that fact, in November 2011, Mr. Beach tells Mr. Defoe, all my income in 2011 was $41,000 for my old job. That clearly wasn't the case given that he had earned $120,000 to that point, $45,000 sent to him personally, and another $75,000 through Beach Petroleum. As a result, all of Mr. Defoe's advice to Mr. Beach has to be seen through the lens of what he knew and what he didn't know at the time. He didn't know about Beach Petroleum. He didn't know about these payments. So when he's talking to him in December of 2011 and he suggests that he can get back to work, that has to be understood through the lens of not understanding what Beach Petroleum is doing, not knowing that it's doing anything but startup activities. He doesn't know that it's earning $15,000 a month. When Mr. Defoe was given the opportunity to talk about at trial what he would have done had he known the full picture, he said time and time again, I would have disclosed these payments. I would have disclosed them as 2011 income. I would have disclosed the payments on the count three Schedule I as projected income. I think it's important also to note, Judge Ullum, I think you made this point. It was a mortal lock that Mr. Beach was going to be paid more money going forward. He sends an invoice to Black Horse Resources on January 27th, 2012. It's really important. This invoice is for work done in December, in January, and for work to be done in the future. So he sends an invoice for money he expects to earn, $15,000, unearned income. That money is wired to him on January 31st, 2012, and he on that same day executes a bankruptcy petition in which he indicates he has no current income and no expectation of earning anything in the future. As a result, there is simply no basis upon which to reverse count three. Before we move off of count three, can we talk about the mens rea requirement? So the government has to prove that he knowingly lied when he said $0 of expected future income. I understand his argument to be, well, yeah, this is income to the trust or to Beach Petroleum, which I gather is owned by the trust? Or is it the other way around? No, you've got it right. So that it's income to those two entities, those are distinct legal entities from me, Mr. Beach. So there's this sentence on page 36 of your brief that says we should reject that because it depends on the rejected premise that Beach was entirely distinct from the company and the trust he controlled. Now lawyers and judges may understand the legal distinctions between trusts, companies owned by trusts, and the ultimate pass-through beneficiary, in this case Mr. Beach. But wouldn't the government have to additionally prove that he knew when he said it was $0 that he also knew that these monies that were being earned or generated or paid to separate and distinct legal entities were somehow attributable to him on the SFA? Certainly, Your Honor. I think, are you talking about, because the count three relates to Schedule I. Sorry, sorry, excuse me. Understood. I have a few responses. I think the court dealt with that precise issue in the Chalker case. The court was considering a person who had purchased a rental property in his own name and then put it in an LLC and was renting it in both entities and he filed for bankruptcy eventually and he said, I didn't rent this property, my, or he didn't say anything. He said, I didn't rent this property. He files for bankruptcy, that's rejected. This court says this literal truth defense didn't fly because that particular person exercised a beneficial interest over that. He was involved with the rental process and so essentially it was a distinction without a difference. I think so too here. Mr. Beach established, he establishes this Beach Petroleum, he establishes the participation agreement, he is doing the work, he is earning the money, he is spending the money. Based on the definition of income that the jury had, based on the definition of income that Mr. Beach himself provided in an April 2012 deposition, I think he was absolutely in a position to know that I'm doing the work, I'm earning the money, I'm controlling the money, I'm spending the money, this is income to me. So I understand the legal argument and I certainly understand the inference that could be drawn upon it, but when he says to his lawyer, my total income is $41,000 and he's obviously excluding the money that these separate legal entities earned, it's consistent with his argument now, which is, it was $0 in the sense that there was more money being generated, the $15,000 and everything else was being generated by distinct legal entities. I would think that the government would need some additional evidence that would show that he either knew or should have known that, I suppose you have to do even more than that right, because the statute says knowingly, that he knowingly was committing fraud when he said $0. It wouldn't be enough to just say he's legally wrong. I think you're right Your Honor, although the court has said in cases like this, it's obviously very complicated to find direct evidence of a criminal's culpable mental state when it comes to a crime like this, so what you have to do is infer from a course of conduct that particular mental state. And I think through the course of conduct, it is clear that Mr. Beach was organizing his activities in a way to conceal income going forward. It's a peculiar arrangement to sign an agreement on a trust's behalf and have your payments directed to that trust rather than to yourself when you are the one doing the work and you are the one spending the money. It is similarly peculiar to have an attorney express deep concern about the arrangement of this trust and then turn around and not tell him about anything that the trust is doing throughout 2011. And this is the case even after Mr. Defoe presses Mr. Beach after the January 2012 creditor's hearing where Mr. Defoe starts learning information for the very first time about Mr. Beach, what he's been up to. He presses him and he tells him you have to disclose everything in order to receive the possibility of a discharge of your debt. Mr. Beach does not correct the impression that his income was only $41,000. He's not correct the misimpression that he is earning nothing going forward. And I think, Your Honor, another point to your question, Mr. Beach indicated in a May 2012 deposition that he had been providing these services for Beach Petroleum and being paid for them. He was simply not confused about this. Any purported confusion arose at the time of trial as a matter of a defense case, but I don't think contemporaneously he had any particular confusion about what was going on. I'd like to make another point about the $90,000 that Ms. Powell indicated had been disclosed. Well, this is a separate $90,000 than the $90,000 that Mr. Beach earned from Black Horse Resources. And this is the case for a few reasons. Sheila Powell, government expert witness on page 549 of the record, testified that that $90,000 came from a separate, it came essentially from the spendthrift portion of the trust. It did not come from the Black Horse Resources. And that makes a lot of sense when you consider Mr. Defoe's testimony. Mr. Defoe talked in that letter about the $90,000, but Mr. Defoe also testified at great length that he didn't know about these Black Horse Resources payments. He didn't know about these monthly payments that had happened all the way through 2011. So taking those two facts together, these $90,000 in payments were not Black Horse Resources payments and as a result, he did not really disclose anything until the April 2012 deposition. And at that point, he still did not disclose the full scope of what he'd been doing in 2011. And with respect to the 2012 April deposition, I'd like to speak to Judge Wiener's point because I do believe that this particular argument has been waived. And I think it's been waived because at the outset of the very brief arguments concerning that particular count, at the very outset, it is posed as if the only problem with count 7 has to do with whether or not there was a mistake about receiving two or three payments. But of course, the first charge, 7A, is an allegation that Mr. Beach lied about whether or not he received only one of the three payments. So by failing to set forth a more fulsome discussion concerning that first false statement, whether or not there was one or three, this Court, I think, should find this count waived as a result of insufficient briefing. And on that basis, it can affirm the entire sentence against Mr. Beach because the Court imposed four four-month concurrent sentences. Of course, the Court has to deal with the other counts, but the sentence alone, I think, can be affirmed on that basis. Judge Graves, to your point, I think it is true that he made this mistake a number of times when it came to disclosures. He made it in January 2012 bankruptcy filings when he didn't disclose the $45,000 he received personally or the other $75,000 he received through the trust. Made the same mistake or lied again in April of 2012 in his depositions two times when he talked about the payments that he received. He only revealed two of them. And then in May of 2012, he makes the exact same mistake. He lies again, actually, in May of 2012 when he says he only received these two payments. Now, I'd like to just spend a brief moment on the matter of what was disclosed because I think the notion that a great many financial documents were disclosed is a vast overstatement of what actually occurred. The only reason Mr. Beach turned over any information in January of 2012 is because the bankruptcy trustee quite rightly accused him of seeking bankruptcy in bad faith. As a result, she sought a number of documents from Mr. Beach which Mr. Defoe provided. Among these documents, there is no mention of Beach Petroleum. There is no mention of the participation agreement. The statements that contain the payments directly to Mr. Beach, I think it's important to note, the only reason that this third payment didn't come out at the deposition is because it is listed only as a line item deposit. It doesn't indicate where it came from. So to suggest that anyone could look at that bank statement and take from it anything about Blackhorse Resources or the participation agreement or income or any meaningful information about his bankruptcy is simply false. So all there were were two wires into his account from Blackhorse Resources, but it doesn't really provide any context as to what they are and it certainly doesn't provide any context about Beach Petroleum, about Blackhorse Resources full activities throughout the course of that year. So the notion that these disclosures, which were certainly not gratuitous, they were forced by the bankruptcy court under a threat of discharging or dismissing his bankruptcy petition is completely false. If the court has no further questions, I will cede the balance of my time and ask this court to affirm the judgment in all respects. Thank you, Counsel. Thank you, Your Honor. Rebuttal. There is no precedent for this case. It is literally an unprecedented prosecution. Checker doesn't apply at all. That was a series of bankruptcies, one after the other, where the guy was trying to forestall foreclosure on his house so every time something came close he would file a bankruptcy and then made false statements in the process. Swaim, for example, the man stole $612,000. This is a case where every dime of the money is accounted for. There's no pot of money that wasn't disclosed. There are no assets sitting somewhere else. Every dime was accounted for. And yes, that $90,000 is pre-petition money. Mr. Defoe argued it was part of the trust. He even argued that the trust itself didn't have to be disclosed. But the trust was disclosed in the original bankruptcy filing. And that trust held Beech Petroleum. It held Black Horse Resources. It held the house. And every government witness, including the trustee, testified that that was sufficient of a disclosure to allow them to follow the assets and find out whatever they needed to find out. They also admitted that the trust wasn't part of the bankruptcy estate or available to creditors. Nonetheless, Mr. Beech went ahead and sold his house long before any criminal charges were suggested and settled this case in a settlement that this court approved on appeal because Mr. Taraji, the creditor, wasn't satisfied with the settlement agreement. He appealed it to the district court. He appealed it to this court. And this court also held that the future income for Beech Petroleum was speculative. And that Mr. Taraji hadn't shown anything that required it to be reported otherwise. So in a sense, that's the law of the case. And there's certainly ample reason to recognize that the future income issue does belong solely to Mr. Defoe. There's no issue of Mr. Beech not having told Mr. Defoe anything that was real, saying, you know, I'm planning on earning $15,000 a month. But one of the most important things is that the trust was disclosed in the original filing and all the government witnesses admitted that was sufficient for them to follow those assets, which included the house, Beech Petroleum, and Black Horse Resources participation agreement. All of the pre-petition money came into the Beech 2010 trust, which of course the original filing disclosed. Defoe did have all the bank records, as did the trustee. Bankruptcy is a process. I don't know of any situation in which someone has been criminally prosecuted for their first bankruptcy filing because it allows for and contemplates amendments and supplements. In fact, this Court in Hoffman, which is the only relevant and analogous case, says that it's not fraud to amend your filings and that's expected. A bankrupt person is entitled to do that. He did correct income. He did correct income. In one of the amendments, the $90,000 that's reported as a distribution from the trust at Record Excerpt 12 also reflects a $349,000 distribution to the debtor for the sale of his father's house, which was in the trust. And on the Record Excerpt 14, which is Government Exhibit 51, the supplement to schedules and statement of financial affairs, he increases his income by $88,000 in No. 2 and reports that the 2010 gross income was $248,835 from the original filing of $160,000. And then it also reports the two payments of $15,000 were sent by Black Horse Resources to the debtor and those payments were made to the Beach 2010 Trust. So between Record Excerpt 12 and Record Excerpt 14, the entire $120,000 in the government's indictment pre-petition was disclosed. This is not the, quote, preposterous situation the court described in Slame. This was all disclosed, and the disclosures of the trust and the later amounts were satisfactory to the trustee. All they offered were opinions and opportunities to disclose that he didn't take. That is no evidence of his criminal intent whatsoever, nor is it evidence of materiality. All right. Thank you, counsel. Your time has expired. Thank you. All right. We'll take this matter under advisement.